IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| K.H., a minor, by and through his Parents,<br>KRISTINE HAHN and CHRISTOPHER HAHN,<br>492 Glen Rock Road<br>Glen Rock, Pennsylvania 17327<br><br>       Plaintiff<br><br>v.<br><br>FRANKLIN SQUARE HOSPITAL CENTER,<br>INC., doing business as MEDSTAR FRANKLIN<br>SQUARE MEDICAL CENTER<br>9000 Franklin Square Drive<br>Baltimore County, Maryland 21237<br><br>       <u>Serve On</u>:<br>       The Corporation Trust, Incorporated<br>       2405 York Road, Suite 201<br>       Lutherville Timonium, Maryland 21093<br><br>And<br><br>MEDSTAR FRANKLIN SQUARE<br>PHYSICIANS, L.L.C.<br>6th Floor, 10980 Grantchester Way<br>Columbia, Maryland 21044<br><br>       <u>Serve On</u>:<br>       The Corporation Trust, Incorporated<br>       2405 York Road, Suite 201<br>       Lutherville Timonium, Maryland 21093<br><br>And<br><br>ADAM DIMITROV, M.D.<br>520 A1A North, Suite 101<br>Ponte Vedra Beach, Florida 32082<br><br>And<br><br>MICHAEL XAVIER DWYER, M.D.<br>9101 Franklin Square Drive, Suite 300<br>Baltimore, Maryland 21237 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No._____<br>)<br>)<br>)   JURY DEMAND<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

|                                                      |   |
|------------------------------------------------------|---|
| And                                                  | ) |
|                                                      | ) |
| DJORDJE GIKIC, M.D.                                   | ) |
| 615 N. Wolfe Street, Room WB602                      | ) |
| Baltimore, Maryland 21205                            | ) |
|                                                      | ) |
| And                                                  | ) |
|                                                      | ) |
| ARLENE RENEE EMMONS, M.D.                            | ) |
| 1227 Rockbridge Road S.W.                            | ) |
| Stone Mountain, Georgia 30087                        | ) |
|                                                      | ) |
| And                                                  | ) |
|                                                      | ) |
| LILIA DURUSSELL, M.D.                                | ) |
| 5005 North Piedras Street, 718 Coeur Dalene Circle   | ) |
| El Paso, Texas 79920-5001                            | ) |
|                                                      | ) |
| And                                                  | ) |
|                                                      | ) |
| RAYMOND K. WRIGHT, M.D.                              | ) |
| 13930 Siena Loop                                     | ) |
| Lakewood Ranch, Florida 34202                        | ) |
|                                                      | ) |
|         Defendants                                   | ) |

## **COMPLAINT**

Plaintiff, K.H., a minor, by and through his Parents, Kristine Hahn and Christopher Hahn, by and through his undersigned attorneys, Brian Cathell, Esquire, Kieran Murphy, Esquire, and Wais, Vogelstein, Forman & Offutt, LLC, hereby sue Franklin Square Hospital Center, Inc., doing business as MedStar Franklin Square Medical Center, MedStar Franklin Square Physicians, L.L.C., Adam Dimitrov, M.D., Michael Xavier Dwyer, M.D., Djordje Gikic, M.D., Arlene Emmons, M.D., Lilia DuRussell, M.D., and Raymond K. Wright, M.D., and for his cause of action states as follows:

## PARTIES

1.     The Plaintiff, K.H., is a minor resident of the Commonwealth of Pennsylvania.

2.     Defendant Franklin Square Hospital Center, Inc., doing business as MedStar Franklin Square Medical Center is, and at all times relevant hereto was, a Maryland corporation engaged in the operation of a hospital, providing obstetrical services and other health care services to individuals in need thereof.  At all times relevant hereto Franklin Square Hospital Center, Inc., doing business as MedStar Franklin Square Medical Center acted directly and, or, by and, or, through its actual and, or, apparent agents, servants, and, or, employees, including, but not limited to, Adam Dimitrov, M.D., Michael Xavier Dwyer, M.D., Djordje Gikic, M.D., Arlene Emmons, M.D., Lilia DuRussel, M.D., and Raymond K. Wright, M.D.

3.     Defendant MedStar Franklin Square Physicians, L.L.C., is, and at all times relevant hereto was, a Maryland limited liability company engaged in the operation of a physician service, providing obstetrical services and other health care services to individuals in need thereof.  At all times relevant hereto MedStar Franklin Square Physicians, L.L.C. acted directly and, or, by and, or, through its actual and, or, apparent agents, servants, and, or, employees, including, but not limited to, Adam Dimitrov, M.D., Michael Xavier Dwyer, M.D., Djordje Gikic, M.D., Arlene Emmons, M.D., Lilia DuRussel, M.D., and Raymond K. Wright, M.D.

4.     Defendant Adam Dimitrov, M.D., at all times relevant hereto, was a physician licensed to practice medicine in the State of Maryland. At all times relevant hereto, Adam Dimitrov, M.D. acted individually and, or, as the actual and, or, apparent agent, servant and, or, employee of Franklin Square Hospital Center, Inc., doing business as MedStar Franklin Square Medical Center and, or, MedStar Franklin Square Physicians, L.L.C.

5.      Defendant Michael Xavier Dwyer, M.D., at all times relevant hereto, was a physician licensed to practice medicine in the State of Maryland. At all times relevant hereto, Michael Xavier Dwyer, M.D. acted individually and, or, as the actual and, or, apparent agent,

servant and, or, employee of Franklin Square Hospital Center, Inc., doing business as MedStar Franklin Square Medical Center and, or, MedStar Franklin Square Physicians, L.L.C.

6.      Defendant Djordje Gikic, M.D., at all times relevant hereto, was a physician licensed to practice medicine in the State of Maryland. At all times relevant hereto, Djordje Gikic, M.D. acted individually and, or, as the actual and, or, apparent agent, servant and, or, employee of Franklin Square Hospital Center, Inc., doing business as MedStar Franklin Square Medical Center and, or, MedStar Franklin Square Physicians, L.L.C.

7.      Defendant Arlene Emmons, M.D., at all times relevant hereto, was a physician licensed to practice medicine in the State of Maryland. At all times relevant hereto, Arlene Emmons, M.D. acted individually and, or, as the actual and, or, apparent agent, servant and, or, employee of Franklin Square Hospital Center, Inc., doing business as MedStar Franklin Square Medical Center and, or, MedStar Franklin Square Physicians, L.L.C.

8.      Defendant Lilia DuRussel, M.D., at all times relevant hereto, was a physician licensed to practice medicine in the State of Maryland. At all times relevant hereto, Lilia DuRussel, M.D. acted individually and, or, as the actual and, or, apparent agent, servant and, or, employee of Franklin Square Hospital Center, Inc., doing business as MedStar Franklin Square Medical Center and, or, MedStar Franklin Square Physicians, L.L.C.

9.      Defendant Raymond K. Wright, M.D., at all times relevant hereto, was a physician licensed to practice medicine in the State of Maryland. At all times relevant hereto, Raymond K. Wright, M.D. acted individually and, or, as the actual and, or, apparent agent, servant, and, or, employee of Franklin Square Hospital Center, Inc., doing business as MedStar Franklin Square Medical Center and, or, MedStar Franklin Square Physicians, L.L.C.

10.     At all times relevant hereto, the Defendants held themselves out to Plaintiff as health care providers who provided reasonable and competent care to individuals in need thereof.

## JURISDICTION AND VENUE

11.     The Plaintiff previously filed this medical negligence claim with the Health Care Alternative Dispute Resolution Office pursuant to Md. Cts. & Jud. Proc. §§ 3-2A-01 – 3-2A-10, for the recovery of damages in excess of Thirty Thousand Dollars ($30,000.00).

12.     Attached hereto and incorporated herein by reference is the Certificate of Qualified Expert and Expert Report of Andrew Robertson, M.D.  The Plaintiff avers that he has satisfied all conditions precedent to the filing of this lawsuit, including the filing of a Statement of Claim, Certificate of Qualified Expert, Expert Report, and Waiver of Arbitration in the Health Care Alternative Dispute Resolution Office of Maryland.

13.     Jurisdiction is proper in this Court due to diversity of citizenship as set forth in 28 U.S.C. §1332.

14.     Venue is proper in the Northern Division of this district because the acts and omissions giving rise to this Complaint occurred in Baltimore County, Maryland.

## FACTS

15.     On March 10, 2003, Kristine Hahn presented for her first prenatal visit at Franklin Square Hospital.  Ms. Hahn was 36 years old at that time.  The providers at Franklin Square Hospital documented that she was a primigravida, meaning this was her first pregnancy.  Her problem list included that she was of advanced maternal age ("AMA"), had a body mass index of 29, had borderline anemia, and was positive for group B streptococcus ("GBS+") bacteria.  She was found at that time to be 5 weeks and 6 days' gestation.  In light of Ms. Hahn's advanced maternal age, this was a high-risk pregnancy.  Following this initial prenatal visit, Ms. Hahn was

seen for regular prenatal visits during her pregnancy at Franklin Square Hospital in the family health center, where her obstetrical care was managed predominantly by Adam Dimitrov, M.D., a resident physician.

16.     On April 17, 2003, Ms. Hahn underwent her first sonogram of this pregnancy for dating purposes.  The sonogram revealed that she had a single intrauterine pregnancy, that she was 11 weeks and 7 days' gestation by sonogram, and that she was 11 weeks and 4 days' gestation by dates.

17.     On June 3, 2003, Ms. Hahn underwent her second sonogram of this pregnancy for fetal abnormality screening.  The sonogram found that she was 18 weeks and 4 days' gestation by sonogram, that the estimated fetal weight was 240 grams, that the fetus had no abnormalities, and that the fetal findings were all within normal limits.

18.     On June 6, 2003, July 7, 2003, August 5, 2003, August 26, 2003, September 12, 2003, September 26, 2003, October 13, 2003, and October 21, 2003, Ms. Hahn presented for routine prenatal visits at Franklin Square Hospital.  At all of these routine prenatal visits, the providers at Franklin Square Hospital documented that there was positive fetal movement, that the fetal heart rate was within normal limits, and that the fundal heights were all within normal limits.

19.     On October 27, 2003, Ms. Hahn presented for a prenatal visit at Franklin Square Hospital.  At that time, she was 38 weeks and 4 days' gestation.  At that time, the providers at Franklin Square Hospital documented that there was positive fetal movement, that the fetal heart rate was within normal limits, and that the fundal height was within normal limits.  At that time, Ms. Hahn was also documented as having an initial blood pressure reading of 142/88.  A second blood pressure reading revealed that her blood pressure was 145/90.  These blood pressure readings at Ms. Hahn's gestational age qualified her for a diagnosis of pregnancy-induced hypertension,

also known as gestational hypertension, which is a hypertensive disorder of pregnancy. According to the American College of Obstetricians and Gynecologists ("ACOG"), hypertensive disorders of pregnancy constitute one of the leading causes of maternal and perinatal mortality worldwide. The decrease in placental perfusion that accompanies maternal vascular spasm in pregnancy-induced hypertension accounts for the increased perinatal mortality and morbidity.

20. On October 27, 2003, Ms. Hahn was discharged without delivering her fetus. As of October 27, 2003, the standard of care required that at the time of diagnosis of pregnancy-induced hypertension, an estimation of fetal growth, an estimation of amniotic fluid status, and a non-stress test be performed. As of October 27, 2003, the standard of care also required that induction of labor and delivery at 39 weeks' gestation be recommended and offered to a mother with pregnancy-induced hypertension and advanced maternal age in order to avoid perinatal morbidity and mortality. ACOG set forth recommended management in the following chart:



**Figure 1.** Recommended management of mild gestational hypertension or preeclampsia.

*Sibai. Gestational Hypertension–Preeclampsia. Obstet Gynecol 2003.*

In violation of the standard of care, Ms. Hahn's providers at Franklin Square Hospital, including, but not limited to Adam Dimitrov, M.D., failed to recommend or offer induction of labor and delivery to Ms. Hahn at 39 weeks' gestation.

21. At 10:00 p.m. on November 9, 2003, at 40 weeks and 4 days' gestation, Ms. Hahn experienced spontaneous rupture of membranes, i.e. her water broke. At that time, she called her providers at Franklin Square Hospital to report that her water broke. Ms. Hahn reported normal fetal movement at that time. Ms. Hahn was advised that she could come in that night or that she could wait to come in until her prenatal appointment the next day, November 10, 2003. As of November 9, 2003, the standard of care required any woman with spontaneous rupture of

membranes at any gestational age to be instructed to immediately report to a hospital. As of November 9, 2003, the standard of care also required any woman with spontaneous rupture of membranes with coinciding diagnoses of pregnancy-induced hypertension and advanced maternal age at 40 weeks and 4 days' gestation to be instructed to immediately report to a hospital. In violation of the standard of care, Ms. Hahn's providers at Franklin Square Hospital failed to instruct her to immediately report to the hospital when she called with complaints of spontaneous rupture of membranes at 40 weeks 4 days' gestation with coinciding diagnoses of pregnancy-induced hypertension and advanced maternal age.

22. On November 10, 2003, Ms. Hahn presented for a scheduled prenatal appointment with Dr. Dimitrov, who had been managing her high-risk pregnancy. She was 40 weeks and 5 days' gestation at that time. At this appointment, Ms. Hahn's blood pressure readings were elevated at 150/100.

23. At 3:08 p.m. on November 11, 2003, following her scheduled prenatal appointment with Dr. Dimitrov, Ms. Hahn was admitted to Franklin Square Hospital as an inpatient for induction of labor due to her elevated blood pressure reading of 150/100. Despite the fact that Ms. Hahn was 40 weeks and 5 days' gestation, that she was of advanced maternal age, that she had a diagnosis of pregnancy-induced hypertension, that she had a blood pressure reading of 150/100, which is elevated, and that she was being admitted for induction of labor, Dr. Dimitrov failed to order that Ms. Hahn be connected to an electronic fetal monitor to assess the fetus' well-being and oxygenation levels. As of November 10, 2003, the standard of care required that any woman, particularly a woman with spontaneous rupture of membranes, coinciding diagnoses of pregnancy-induced hypertension and advanced maternal age, and admission for induction of labor at 40 weeks and 5 days' gestation, be immediately connected to the electronic fetal monitor to assess the fetus'

well-being and oxygenation levels. In violation of the standard of care, Ms. Hahn's providers at Franklin Square Hospital, including but not limited to Dr. Dimitrov, failed to connect Ms. Hahn to the electronic fetal monitor at the time of her admission.

24.     At 3:25 p.m. on November 10, 2003, Tammy Williams, R.N., recorded an obstetric admitting record, which stated that Ms. Hahn was 40 weeks and 5 days' gestation, that she was of advanced maternal age, that she had a blood pressure reading of 157/90, which is elevated, and that she was being admitted for induction of labor. Despite documenting the existence of these problems, Ms. Williams failed to connect Ms. Hahn to an electronic fetal monitor to assess the fetus' well-being and oxygenation levels. As of November 10, 2003, the standard of care required that any woman, particularly a woman with spontaneous rupture of membranes, coinciding diagnoses of pregnancy-induced hypertension and advanced maternal age, and admission for induction of labor at 40 weeks and 5 days' gestation, be immediately connected to the electronic fetal monitor to assess the fetus' well-being and oxygenation levels. In violation of the standard of care, Ms. Hahn's providers at Franklin Square Hospital, including but not limited to Dr. Dimitrov, failed to connect Ms. Hahn to the electronic fetal monitor at the time of her admission.

25.     At 3:40 p.m. on November 10, 2003, Ms. Hahn's urinalysis results revealed that her protein urine was 2+, which is consistent with proteinuria, a condition that elevates the diagnosis of pregnancy-induced hypertension to the diagnosis of preeclampsia. Despite meeting the criteria for preeclampsia at 3:40 p.m. on November 10, 2003, Ms. Hahn was not connected to an electronic fetal monitor to assess the fetus' well-being and oxygenation levels. In violation of the standard of care, Ms. Hahn's providers at Franklin Square Hospital failed to connect Ms. Hahn to the electronic fetal monitor at the time of her documented proteinuria.

26.     At 4:32 p.m. on November 10, 2003, more than an hour after being admitted to Franklin Square Hospital as an inpatient for induction of labor due to elevated blood pressure readings at 40 weeks and 5 days' gestation with coinciding diagnoses of advanced maternal age and pregnancy induced hypertension with new onset proteinuria consistent with preeclampsia, Kellie Zink, R.N. documented that Ms. Hahn was finally connected to an electronic fetal monitor. At that same time, her blood pressure reading was 151/84, which is elevated, and the fetal heart rate monitor revealed decreased variability, as documented by the providers. The finding of decreased or absent variability in the fetal heart rate is a non-reassuring finding of possible fetal hypoxic-ischemic injury, particularly in a pregnancy at 40 weeks and 5 days' gestation with coinciding diagnoses of pregnancy-induced hypertension and advanced maternal age, with new onset proteinuria consistent with preeclampsia. Despite this non-reassuring finding of decreased and absent variability at 4:32 p.m. on November 10, 2003, in violation of the standard of care, Ms. Hahn's providers at Franklin Square Hospital failed to further assess fetal well-being through a non-stress test or biophysical profile, failed to perform adequate intrauterine resuscitative measures to improve fetal oxygenation and well-being, and failed to order a cesarean section delivery.

27.     At 5:00 p.m. on November 10, 2003, Djordje Gikic, M.D. completed the obstetrical admission history and physical exam of Ms. Hahn. Dr. Gikic documented that Ms. Hahn was 40 weeks and 5 days' gestation with a chief complaint of hypertension, that she was negative for contractions, that she did not feel any fetal movement today, and that she had "prolonged" rupture of membranes. He noted that her most recent blood pressure readings were 157/80, 151/84, and 146/86, all of which were elevated. He also noted that her urine was positive for 2+ protein. His obstetrical exam noted that Ms. Hahn was 1.5 cm dilated and 1.5 effaced and that her fetus was in

the -2 station. He also noted that the fetal heart rate exhibited decreased variability. His impression was that Ms. Hahn was a 37-year-old with pregnancy-induced hypertension. Despite documenting the foregoing, Dr. Gikic's plan was to "admit to [labor and delivery], Pit[ocin] augmentation after cytotec 25 mg." He also noted that he discussed the case with Michael Xavier Dwyer, M.D. Despite the continued non-reassuring finding of decreased and absent variability for approximately 30 minutes, in violation of the standard of care, Ms. Hahn's providers at Franklin Square Hospital, including but not limited to Dr. Gikic and Dr. Dwyer, failed to order an immediate cesarean section delivery.

28.     At 5:20 p.m. on November 10, 2003, penicillin was administered for GBS+ prophylaxis.

29.     At 5:33 p.m. on November 10, 2003, Ms. Hahn's blood pressure reading was 148/86, which was elevated, and the electronic fetal monitor revealed continuing decreased variability, which was non-reassuring. This non-reassuring finding had now been present and documented for over an hour.

30.     At 5:45 p.m. on November 10, 2003, Kellie Zink, R.N. paged Dr. Dwyer and relayed her concerns regarding the decreased variability on the fetal heart rate tracing and asked that he perform a biophysical profile. Dr. Dwyer agreed to have a biophysical profile performed. Kellie Zink, R.N. also paged Arlene Emmons, M.D., Raymond Wright, M.D., and Dr. Dimitrov, and made them aware of the non-reassuring decreased variability on the fetal heart rate tracing. Lilia DuRussel, M.D. was expected to perform the biophysical profile. Despite the continued non-reassuring finding of decreased and absent variability for over an hour, in violation of the standard of care, Ms. Hahn's providers at Franklin Square Hospital, including but not limited to Dr. Dwyer,

Dr. Emmons, Dr. Wright, Dr. Dimitrov, and Dr. DuRussell, failed to order an immediate cesarean section delivery.

31. At 5:50 p.m. on November 10, 2003, 25 micrograms of misoprostol, i.e. cytotec, was administered intra-vaginally for cervical ripening.

32. At 6:20 p.m. on November 10, 2003, Dr. DuRussel performed a vaginal exam which revealed that Ms. Hahn was 3 cm dilated and 60% effaced.

33. At 6:22 p.m. on November 10, 2003, the electronic fetal monitor was removed by Kellie Zink, R.N., for Dr. DuRussel to perform the biophysical profile. Ms. Zink noted that "FHR pattern remains same with baseline 140s. No response to scalp stimulation with vaginal exam."

34. At 6:36 p.m. on November 10, 2003, Ms. Hahn's blood pressure reading was 160/45, which was elevated, and the fetal heart rate monitoring was noted to have continuing decreased variability.

35. At 6:59 p.m. on November 10, 2003, Dr. Emmons, the third year resident and the obstetrical chief on-call, was called by Dr. DuRussel to come and evaluate Ms. Hahn secondary to the decreased variability of over 2 hours and the non-responsive biophysical profile. Dr. Emmons documented the following:

> Mom states that she has barely felt the fetus move today. Fetal heart rate since admission has been 140s with decreased variability with several spontaneous decelerations down to 130s lasting 60 seconds. Dr. DuRussell stated that she was 10 minutes into the BPP and he only found an amniotic fluid pocket of 2.3. She also states fetus had minimal reaction to scalp stimulation. I continued the BPP for 20 additional minutes and only witnessed 1 gross movement at the end of the time period. NO fine movement or fetal breathing noted. BPP 2/10. Case was discussed with DuRussell, Dr. Wright, Dr. Dwyer, and Dr. Dimitrov. Based on BPP and patient's recent cervical exam of 3/60 it was concluded that patient is remote from delivery with non-reassuring fetal status. Therefore, an elective decision to proceed with cesarean section was made.

Despite the fact that all of these providers had been aware of the non-reassuring fetal status for several hours before this decision, in violation of the standard of care, the providers at Franklin Square Hospital, including but not limited to Dr. Dimitrov, Dr. Dwyer, Dr. Gikic, Dr. Emmons, Dr. DuRussel, and Dr. Wright, waited until 6:59 p.m. on November 10, 2003 to proceed with an immediate cesarean section delivery. Additionally, in violation of the standard of care, after Dr. DuRussel found a non-reactive biophysical profile 10 minutes into the exam, Dr. Emmons improperly extended the biophysical profile for another 20 minutes without making any additional findings.

36.     At 7:00 p.m. on November 10, 2003, Dr. Dwyer and Dr. Dimitrov entered a family practice attending note, which documented that Ms. Hahn was admitted for an elevated blood pressure reading of 150/100 at the family health center and rupture of membranes and that she was noted to have decreased variability since admission. The note also documented that the case was discussed with Dr. DuRussel, Dr. Emmons, and Dr. Wright, and that the decision was made to proceed with a cesarean section delivery because the "baby would likely not tolerate labor." There had been evidence that the baby would not tolerate labor since Ms. Hahn's admission several hours earlier.

37.     At 7:01 p.m. on November 10, 2003, Dr. DuRussel, the second year obstetrical resident, entered a progress note. Dr. DuRussel documented that Ms. Hahn had been "admitted secondary to elevated [blood pressure readings] with 2+ protein and asymptomatic neurological exam." She also documented that she "was called by nurse secondary to minimal LTV [long-term variability] of patient since admission at 4:30 p.m." She also documented that she evaluated Ms. Hahn with Dr. Dimitrov, the family practice resident who was managing Ms. Hahn's prenatal care. She documented that the biophysical profile that she performed scored 2 out of 10 with no fetal

breathing, no gross fetal movement, no fine fetal movement, and a non-reactive non-stress test. She noted that the plan was a cesarean section delivery "for non-reassuring fetal status/remote from delivery." Notably, Ms. Hahn was remote from delivery with a non-reassuring fetal status at the time of her admission, more than two hours before Dr. DuRussel's note was entered.

38.     At 7:10 p.m. on November 10, 2003, a preoperative nursing assessment noted that Ms. Hahn's blood pressure reading was 160/95, which was elevated, and that the preoperative diagnosis, i.e. the reason for the operation, was "fetal non-reassuring fetal heartrate." Again, the non-reassuring fetal heartrate had been present since Ms. Hahn was first connected to the electronic fetal monitor at 4:32 p.m. on November 10, 2003.

39.     At 7:20 p.m. on November 10, 2003, Ms. Hahn was taken to the operating room.

40.     At 7:36 p.m. on November 10, 2003, anesthesia was started.

41.     At 7:55 p.m. on November 10, 2003, the procedure was started.

42.     At 8:08 p.m. on November 10, 2003, K.H. was born via cesarean section delivery.

Dr. Wright listed the indications for the procedure as follows:

> The patient at the Family Health Center is a 37-year-old, para 0, at 40 and 5/7 weeks with an EDC of 11/05/03 who had presented to the Family Health Center today for routine prenatal care. She was found to have a blood pressure elevation of 150/100 with questionable [REDACTED IN RECORD]. The patient's cervix at the time per admitting Family Practice resident was found to be dilatation at 1 and ½, effacement 1 and ½, station -2 and ruptured. The patient's fetal heart rate at admission was 140s with decreased variability. The patient was admitted and was to be induced for gestational hypertension and preeclampsia. The patient, on admission at approximately 4:30 p.m. on 11/10 continued to have decreased variability. Family Practice consulted with OB at which time myself, Dr. DuRussell checked the patient and found her cervix to be 3, 60, -3. Did scalp stim with minimal to no response to scalp stim. A biophysical profile was performed and found to be 2 out of 10 with a 2.3 cm pocket of fluid. No to minimal fetal movement visualized throughout the biophysical profile. The patient was given risks, benefits and alternatives due to the decreased long-term variability and biophysical profile of 2 out of 10, was recommended a C-section be performed.

K.H.'s Apgar scores were 6 at 1 minute and 8 at five minutes. His venous cord gas revealed a pH of 7.08 and a base excess of -10, consistent with asphyxia-induced hypoxic-ischemic encephalopathy.

43.     At 8:08 p.m. on November 10, 2003, K.H. was transferred to the neonatal intensive care unit. He was resuscitated and intubated with an endotracheal tube and bagged. He was documented to be apneic, breathing only every couple seconds at 5 minutes of life while extubated, and hypertonic.

44.     At 9:50 p.m. on November 10, 2003, a neonatologist admission note by Dr. Elliott noted that K.H. was depressed and brought to the NICU for perinatal depression. Dr. Elliott also documented that K.H. was "a hypertonic male infant who is intubated and who responds to stimuli but otherwise has little spontaneous respirations" and that "the ventilator is doing all of his breathing, and he is hypertonic, particularly in his extremities."

45.     At 10:00 p.m. on November 10, 2003, K.H. was given an admission diagnosis of "depressed infant" and a nursing assessment documented "jitteriness and seizures."

46.     At 12:22 a.m. on November 11, 2003, K.H.'s confirmed diagnoses included seizures, with "rhythmic movements that continue when arm is restrained, and eye rolling back."

47.     At 1:11 a.m. on November 11, 2003, Nancy Sumpter, a neonatal nurse practitioner, noted a primary diagnosis of mild to moderate asphyxia for K.H.

48.     At 11:00 a.m. on November 11, 2003, a progress note listed K.H.'s diagnoses as post-term and hypoxia.

49.     At 12:03 p.m. on November 11, 2003, a head ultrasound was performed on K.H. The head ultrasound revealed slit-like ventricles that were difficult to visualize. This was consistent with a recent asphyxia-induced hypoxic-ischemic insult.

50.     On November 11, 2003, an electroencephalogram showed evidence of abnormal brain activity.

51.     On November 14, 2003, a second electroencephalogram showed continued evidence of abnormal brain activity.

52.     At 11:25 a.m. on November 17, 2003, an MR of K.H.'s brain was performed. The MR was interpreted as normal, however, the radiologist noted that the patient motion artifact created technical limitations and a follow-up examination was recommended due to the technical limits imposed by the motion artifact.

53.     On November 18, 2003, Dr. Shafrir performed a pediatric neurology consultation on K.H. He reviewed the MR imaging and concluded that there was evidence of ischemic injuries due to asphyxia. Dr. Shafrir also noted that "signs of asphyxia included high CPK and slightly elevated transaminases." Dr. Shafrir indicated that "clarification will be possible in the future by repeat MRI."

54.     At 4:15 p.m. on January 12, 2017, a repeat MRI was performed and reviewed by Paul Singer, M.D. The MRI was performed due to K.H.'s "anoxic insult at birth" and "developmental delay." The repeat MRI found "mildly prominent white matter changes on the left" which were thought to be "related to previous insult."

55.     K.H. suffers from brain damage, developmental delays, intellectual disability, speech impairment, language impairment, and other injuries as a result of the negligence of the Defendants.

## CAUSE OF ACTION

### Count I
### (Medical Malpractice)

56. Plaintiff repeats, re-alleges, adopts, and incorporates by reference the above paragraphs of this Complaint as if fully set forth herein.

57. In their care and treatment of Kristine Hahn and K.H., the Defendants, acting directly, individually, and, or, by and, or, through their actual and, or, apparent agents, servants, and, or, employees, owed to Plaintiff the duty to exercise that degree of care and skill which a reasonably competent hospital, physician, obstetrician, perinatologist, and, or, similar healthcare provider would have exercised under the same or similar circumstances.

58. The Defendants, acting directly, individually, and, or, by and, or, through their actual and, or, apparent agents, servants, and, or, employees, breached the aforesaid duty of care to Kristine Hahn and K.H., and were negligent by:

   a. Failing to maintain adequate and, or, appropriate written policies, procedures and, or, protocols;

   b. Failing to appropriately follow written policies, procedures and, or, protocols;

   c. Failing to appropriately treat Kristine Hahn and K.H.;

   d. Failing to recommend induction of labor at 39 weeks' gestation in light of Kristine Hahn's diagnoses of advanced maternal age and pregnancy-induced hypertension;

   e. Failing to perform fetal growth measurements on October 27, 2003, and thereafter, in light of Kristine Hahn's diagnoses of advanced maternal age and pregnancy-induced hypertension;

f. Failing to assess amniotic fluid status on October 27, 2003, and thereafter, in light of Kristine Hahn's diagnoses of advanced maternal age and pregnancy-induced hypertension;

g. Failing to perform fetal non-stress tests on October 27, 2003, and thereafter, in light of Kristine Hahn's diagnoses of advanced maternal age and pregnancy-induced hypertension;

h. Failing to perform fetal biophysical profiles on October 27, 2003, and thereafter, in light of Kristine Hahn's diagnoses of advanced maternal age and pregnancy-induced hypertension;

i. Failing to instruct Kristine Hahn to immediately report to the hospital when she called with complaints of spontaneous rupture of membranes on the evening of November 9, 2003;

j. Failing to immediately connect Kristine Hahn to continuous fetal heart monitoring on November 10, 2003, when she first presented to the hospital with complaints of spontaneous rupture of membranes and elevated blood pressure readings;

k. Failing to connect Kristine Hahn to continuous fetal heart monitoring at 3:08 p.m. on November 10, 2003, when she was admitted to the labor and delivery department with complaints of spontaneous rupture of membranes and elevated blood pressure readings;

l. Failing to immediately perform a fetal non-stress test when the initial fetal heart rate tracing at 4:32 p.m. on November 10, 2003 showed absent variability with no accelerations;

m.  Failing to immediately perform a fetal biophysical profile when the initial fetal heart rate tracing at 4:32 p.m. on November 10, 2003 showed absent variability with no accelerations;

n.  Failing to immediately perform intrauterine resuscitative measures to improve fetal oxygenation when the initial fetal heart rate tracing at 4:32 p.m. on October 10, 2004 showed absent variability with no accelerations;

o.  Failing to stop the biophysical profile after the first 10 minutes when the healthcare providers found no evidence of fetal breathing, fine fetal movement, or gross fetal movement, and there was a non-reactive non-stress test;

p.  Continuing the fetal biophysical profile for an additional 20 minutes when there was no evidence in the prior 10 minutes of fetal breathing, fine fetal movement, or gross fetal movement, and there was a non-reactive non-stress test;

q.  Failing to perform the cesarean section delivery for more than an hour after ordering the cesarean section delivery STAT due to several hours of documented absent variability;

r.  Failing to timely deliver K.H. at all points after 39 weeks' gestation; and

s.  Were in other ways negligent.

59.  As a result of the above-mentioned deviations from the applicable standards of care by the Defendants, which were a direct and proximate cause and substantial contributing factor of K.H.'s injuries, K.H. suffered and, or, will suffer the following permanent injuries, among others:

a.  Brain damage;

b.  Multi-organ injury;

c.  Developmental delay;

d. Cognitive and mental impairment;

e. Tone abnormalities;

f. Neurological disabilities;

g. Physical impairment;

h. Significant conscious pain and suffering;

i. Emotional distress;

j. Permanent dependence upon others for his care;

k. Serious and painful medical procedures;

l. Significant past and future medical and other care expenses for which he and his parents are incapable or unable to pay;

m. Severely diminished earning capacity; and

n. Other injuries and damages.

WHEREFORE, the Plaintiff, K.H., a minor, by and through his Parents, Kristine Hahn and Christopher Hahn, brings this action against the Defendants and seeks damages that will adequately and fairly compensate him for his injuries, costs, and such other and further relief as may be deemed appropriate.

Respectfully submitted,

WAIS, VOGELSTEIN, FORMAN & OFFUTT, LLC

/s/ *Kieran Murphy*
Brian Cathell, Esquire
Federal Bar No. 19303
Kieran Murphy, Esquire
Federal Bar No. 20718
1829 Reisterstown Road, Suite 425
Baltimore, Maryland 21208
Telephone: (410) 998-3600
Facsimile: (410) 998-3680
brian@malpracticeteam.com
kieran@malpracticeteam.com
***Attorneys for Plaintiff***